UNITED STATES DISTRICT COURT
WEESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

VENTURIT, INC., individually and
derivatively on behalf of PHOTOSYNQ,
INC.,

      *Plaintiff*,

v.

DAVID KRAMER,

LUKA KRAMER,

SEBASTIAN KUHLGERT, and

JAN INGENHOUSZ INSTITUTE,

      *Defendants*.

Civil No. 23-_____ CV

HON.

**JURY DEMAND**

---

/

**BUTZEL LONG, P.C.**
Aaron L. Davis (P77406)
Garett L. Koger (P82115)
Steven R. Eatherly (P81180)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864
(517) 372-6622
davisa@butzel.com
koger@butzel.com
eatherly@butzel.com
*Counsel for Plaintiff*

/

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff complains as follows:

## INTRODUCTION

1.     This is a derivative action brought by shareholder Venturit, Inc. ("Venturit") on behalf of the corporation, PhotosynQ, Inc. ("PhotosynQ").  Venturit is wholly owned by Chandana Prabode Weebadde—a director, and the Chief Executive Officer and President of PhotosynQ.

2.     PhotosynQ helps plant scientists and farmers make informed decisions on crop performance by providing state of the art handheld instruments that track photosynthesis efficiency, and actionable analytical tools for precision farming. PhotosynQ allows customers to connect and collaborate with other scientists and farmers across the world by joining projects and sharing measurements on the PhotosynQ Global Community open-data platform.

3.     This case involves current director and shareholder David M. Kramer individually and in concert with his son, Luka Kramer, misappropriating PhotosynQ's trade secrets and confidential information in attempting to replicate PhotosynQ's business model through his new employer, the Jan IngenHousz Institute ("JII") in the Netherlands.  Dr. Kramer has further solicited fellow shareholder Sebastian Kuhlgert for a position at JII, and seeks to dissolve PhotosynQ without notice and consideration to Mr. Weebadde.

## PARTIES

4.     Plaintiff Venturit is a Michigan corporation with a registered office at 2721 Sophiea Parkway in Okemos, Michigan 48864.  Venturit is a shareholder of PhotosynQ.  Venturit is wholly owned by Chandana Prabode ("Pro") Weebadde—a

co-founder of PhotosynQ, as well as a director, and CEO and President of PhotosynQ.

5.      PhotosynQ, Inc., is a Delaware corporation with a registered office at 325 East Grand River Avenue, Suite 320 in East Lansing, Michigan 48823. PhotosynQ has only three shareholders: (*i*) Venturit (40.5%); (*ii*) David M. Kramer (40.5%); and (*iii*) Sebastian Kuhlgert (19.5%).  PhotosynQ's board of directors consists of only two directors: Mr. Weebadde and Dr. Kramer.  PhotosynQ was converted from a Michigan limited liability company in May 2019. **Ex. 1**.

6.      Defendant David M. Kramer, PhD, is a citizen of the United States, and upon information and belief, has moved to and is now domiciled in the Netherlands.  Dr. Kramer is a co-founder of PhotosynQ, as well as director and shareholder of PhotosynQ.  Upon information and belief, Dr. Kramer is the director of the Jan IngenHousz Institute in the Netherlands.  He remains a professor at Michigan State University in the College of Natural Science, and upon information and belief, he has taken a two-year leave of absence.

7.      Defendant Jan IngenHousz Institute ("JII" or the "Institute"), upon information and belief, is a photosynthesis research institute located at Bornsesteeg 48, 6708 PE in Wageningen, Netherlands.  JII was launched in October of 2023 and co-founded by Wageningen University & Research and The Photosynthesis 2.0 Research Fund through a €62 million investment.

8.      Defendant Luka S. Kramer is the son of Dr. Kramer and is a citizen of the United States, and upon information and belief, is domiciled at 2673 Elderberry

3

Drive in Okemos, Michigan 48864.  Luka Kramer was an employee of PhotosynQ developing certain technologies on behalf of PhotosynQ.

9.    Defendant Sebastian Kuhlgert is a citizen of Germany, and upon information and belief, is domiciled at 1822 Sunnymede Lane in Lansing, MI 48906.  Mr. Kuhlgert was a co-founder of PhotosynQ and is a shareholder of the corporation.  He is an employee of the Michigan State University Plant Research Laboratory.  Upon information and belief, Mr. Kuhlgert is on an H1B visa sponsored by Michigan State University, which disqualified him from performing any direct work or contributions to PhotosynQ other than being a passive shareholder.

10.    Michigan State University ("MSU") is a public, land-grant university and one of the top research universities in the world.  See also Mich. Comp. Laws § 390.101 *et seq*.  It is located at 426 Auditorium Road in East Lansing, Michigan 48824.  MSU and PhotosynQ are parties to an exclusive licensing agreement over certain intellectual property utilized by PhotosynQ for commercial purposes.[1]

## JURISDICTION

11.    This action presents federal questions that arise under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.  The Court therefore has original subject-matter jurisdiction under Article III of the Constitution of the United States and 28 U.S.C. § 1331.

---

[1]    At the time of filing this complaint, it is expected that MSU will seek intervention in this litigation to protect its property interests which are not adverse to PhotosynQ.

12.     Declaratory and injunctive relief is authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

13.     The Court has supplemental subject-matter jurisdiction over pendent state law claims under 28 U.S.C. § 1367(a).

**VENUE**

14.     A substantial part of the events and omissions giving rise to the claims in this Derivative Complaint occurred in the City of East Lansing, a municipality located in Ingham County, Michigan.   Ingham County is within the territorial jurisdiction of the Western District of Michigan.  28 U.S.C. § 102(a)(1).  This Court is therefore a proper venue for this action under 28 U.S.C. § 1391(b)(2).

**DERIVATIVE STANDING**

15.     Plaintiff Venturit is a shareholder of PhotosynQ during all times of the alleged misconduct by Defendants and currently holds 40.5% ownership in PhotosynQ.  **Ex. 2**, 7-25-2020 PhotosynQ Share Restructure.  Venturit is wholly owned by Mr. Weebadde—a director and CEO and President of PhotosynQ—who called for the special meeting of the PhotosynQ board of directors and called for the vote on the derivation action, which was refused (discussed below).

16.     Venturit has been injured by Defendants' tortious conduct and breaches of contract which have unlawfully diminished PhotosynQ's shareholder value and has threatened the continued viability of PhotosynQ.

IBUTZEL\000162468\0001\100600076.v3-12/14/23

**DEMAND REFUSAL**

17.     Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, on November 22, 2023, counsel for Venturit sent a Demand for Corrective Actions by PhotosynQ to Defendants and Michigan State University (the "Demand").  **Ex. 3**, Demand.  Specifically, Venturit made the derivative demand that a civil action be commenced in the name of PhotosynQ and against Dr. Kramer, Luka S. Kramer, JII, and any other persons and/or entities who have failed to act in the best interests of PhotosynQ, damaged its value, and caused irreparable harm.  *Ibid*.

18.     Alternatively, to avoid the commencement of litigation, Venturit demanded the following relief in full:

A.  David M. Kramer immediately cease and desist from competing with PhotosynQ, including its products, community platforms, and devices, through JII or any other third parties;

B.  Sebastian Kuhlgert immediately cease and desist from competing with PhotosynQ, including its products, community platforms, and devices, through JII or any other third parties;

C.  David M. Kramer and Sebastian Kuhlgert sign non-compete agreements with PhotosynQ;

D.  David M. Kramer provide his written resignation as a director of PhotosynQ in accordance with the Bylaws;

E.  David M. Kramer and Luka Kramer agree to return to Mr. Weebadde, in his role as PhotosynQ's CEO and President, all prototypes (including, MicroPoroQ/MicroFlou and MicroPAR), knowledge, intellectual property,

6

trade secrets, and confidential information, or any other property covered under the Exclusive Licensing Agreement belonging to PhotosynQ or Michigan State University; and

F.  David M. Kramer and Sebastian Kuhlgert agree that their shares are to be redeemed by PhotosynQ, pursuant to the Shareholder Agreement, **Ex. 4**, Shareholder Agmt, ¶9(d).  [**Ex. 3**, Demand.]

19.     Simultaneously with the Demand, Mr. Weebadde, in his capacity as President of PhotosynQ, called for a special meeting of PhotosynQ's board of directors to discuss the commencement of derivative litigation, set for November 27, 2023.  **Ex. 5**, Notice of Special Meeting.

20.     Dr. Kramer responded to the Demand and the Notice of Special Meeting, denying any liability and requesting to delay the special meeting.  **Ex. 6**, 11-24-2023 D. Kramer Email.

21.     At the special meeting, Dr. Kramer had attended along with Mr. Weebadde; in turn, a quorum was present under the bylaws.  **Ex. 7**, PhotosynQ Bylaws, ¶4.9.  Without any investigation into the demand, Dr. Kramer voted no to the commencement of the derivative action, and thus, the PhotosynQ board wrongfully refused the pre-suit demand.  This refusal was made in bad faith as the board knowingly acted against the best interests of PhotosynQ—but instead in the self-interests of Dr. Kramer.

22.     Despite Venturit making the Demand, the Court should find that the demand was nevertheless futile as PhotosynQ's board, which again consists of only

Mr. Weebadde and Dr. Kramer, was conflicted due to Kramer's lack of independence or disinterestedness to consider the Demand.  Specifically, Dr. Kramer received and continues to receive a material personal benefit from his unlawful misconduct that is the subject of this litigation; and the Demand requested litigation against himself, his son, and his new employer at JII, which subjects them to personal liability.

## GENERAL ALLEGATIONS

### Background of PhotosynQ

23.     In 2015, co-founders Pro Weebadde, David Kramer, and Sebastian Kuhlgert recognized the need for a more accessible scientific instrument for plant phenotyping within the research and farming community.  Their backgrounds in the studies of photosynthesis, biochemistry, and computer science allowed them to create PhotosynQ and its flagship instrument, the MultispeQ.  These were created to eliminate the technological gap in the world agricultural industry and to help protect crop yields and strengthen global food security.

24.     They created a beta instrument and released it to the hundreds of beta-testers worldwide, who in turn helped to develop the project and make PhotosynQ a reality.

25.     Mr. Weebadde has been the principal investor in PhotosynQ and has worked for eight years as the CEO building PhotosynQ without taking any salary. He also has personally guaranteed loans for the benefit of PhotosynQ.

26.     Since its inception, PhotosynQ has collaborated with Michigan State University to develop the plant phenotyping technologies in the MSU laboratories.

8

27. PhotosynQ and MSU had entered into the Exclusive License Agreement on July 1, 2018, where PhotosynQ obtained exclusive rights in and to patent rights and copyrights for the purposes of exploiting such rights commercially. **Ex. 8**, Exclusive License Agmt. PhotosynQ's rights to the technology at issue are non-adverse to MSU.

28. The MultispeQ is PhotosynQ's flagship instrument. It combines the functionality of a handheld fluorometer, a chlorophyll meter, and a bench-top spectrometer into one low-cost, modifiable tool that brings lab-quality measurements to field applications. The MultispeQ measures photosynthetic phenotypes in real field conditions, identifies biotic and abiotic stresses in plants or algae and collects thousands of data points around the world using customers in the PhotosynQ network. PhotosynQ has sold over 3,000 MultispeQs since 2016 and continues to sell more.




IBUTZEL\000162468\0001\100600076.v3-12/14/23

29.     With cloud-based data collection and easy-to-use online analytics, alongside the most easily accessible phenotyping instrument in the industry, PhotosynQ is able to help projects.

30.     PhotosynQ provides a one of a kind open platform for its users to input and share their photosynthetic data, connect and collaborate with other users around the world, and analyze their data, including tracking improvements and setting growth goals.  PhotosynQ allows customers to connect and collaborate with other scientists across the world by joining projects and sharing measurements on its open source platform.

31.     PhotosynQ users need not purchase the MultispeQ or other PhotosynQ products to gain access to PhotosynQ's platform, but users must register with PhotosynQ and provide their data to utilize the PhotosynQ platform.

32.     PhotosynQ allows users to access the application through a desktop, supported android devices, and the web. These user-friendly apps allow PhotosynQ users to access or join projects and take measurements in a field, greenhouse, growth chamber, or lab; allow users to take measurements in the lab while saving small scale experiments to the notebook; and assist users in analyzing and organizing data as well as creating new projects, collaborating with other users, and interacting with PhotosynQ technology and documentation.

33.     With a simple, efficient, cost-effective handheld instrument, the possibilities are endless with PhotosynQ technology.

34.     PhotosynQ provides inclusive help pages to assist in the use and navigation of the MultispeQ, web app, desktop app, and mobile app.

10

35.     PhotosynQ's platform aides over 8,000 users in over 30 countries in their growing operations and scientific experimentation.



MicroPAR and MicroPoroQ

36.     In July 2018, PhotosynQ hired Luka S. Kramer, at the behest of his father, out of high school to work for and develop new technologies on behalf of PhotosynQ.

37.     As a condition of his employment, Luka Kramer signed an employment agreement and the Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") with PhotosynQ.  **Ex. 9**, L. Kramer Employment Agmt; **Ex. 10**, Confidentiality Agmt.  These agreements set forth the terms and conditions of Luka Kramer's employment with PhotosynQ and his continuing confidentiality obligations for PhotosynQ's property.

38.     Due to the global chip shortage during the Covid-19 pandemic, PhotosynQ began to research and develop other technologies that would perform the same functional processes as the MultispeQ while utilizing less chips. PhotosynQ had to also change its hardware designs to use available chips causing

11

software updates. PhotosynQ has further been trying to minimize the impact of the chip shortage by identifying the most compatible chips and sensors for reengineering. **Ex. 11**, PhotosynQ 2022 Status Report, p. 6.

39. Upon Dr. Kramer's selection, Luka Kramer was selected for the new research tasks to be performed with the help of David Kramer and his MSU lab associates. Accordingly, from 2021 to 2023, Luka Kramer was tasked with leading and developing new technologies for PhotosynQ—specifically, the MicroPAR and MicroPoroQ. These new technologies and devices are intended to perform the same functional processes as the MultispeQ while utilizing less chips and provide cost-savings for PhotosynQ and its customers.

40. Luka Kramer spent his time working on the MicroPAR and MicroPoroQ technologies, as evidenced by his time sheets, and was paid for this work.

41. In January 2023, Luka Kramer requested a pay raise from PhotosynQ. **Ex. 12**, 1-2023 Email Chain. Mr. Weebadde agreed to the pay raise provided that Luka Kramer could present a plan and timelines for taking the MicroPAR and MicroPoroQ from proof of concept to beta. *Ibid*.

42. Video recordings evidence Luka Kramer and Dr. Kramer presenting working prototypes for the MicroPAR and MicroPoroQ. They were at the last stages of prototyping and one has passed the lab tests while the other needs couple of iterations based on the last update by Luka Kramer and Dr. Kramer. Upon information and belief, the MicroPAR and MicroPoroQ were working at the controlled demo stage.

<u>Dr. Kramer's Departure for JII & Luka Kramer's Resignation</u>

12

43.     In October 2023, Mr. Weebadde had learned from others that Dr. Kramer had left (earlier than the timeline he shared with Mr. Weebadde) to work as the director of JII in the Netherlands.  In a prior meeting between Dr. Kramer and Mr. Weebadde, Dr. Kramer informed that he would lead open research at JII as the director; however, upon leaving, Mr. Weebadde inquired for an update about the two new products, among other things, when Dr. Kramer replied with his intention and plan to make PhotosynQ's property open source via JII, *infra* ¶50.

44.     Upon information and belief, JII was launched on October 1, 2023.  **Ex. 13**, Jan IngenHousz, *Jan IngenHousz Institute working on improving sunlight use to boost crop production*, https://perma.cc/3TQ2-UNWD (captured Nov. 9, 2023).

45.     Dr. Kramer was repeatedly quoted in the JII announcement as follows: "[W]e will need to use the real world as a laboratory. **One of the first essential steps is to develop advanced photosynthesis sensors and data science tools**. They can continuously record in great detail how photosynthesis responds to changes in conditions in many thousands of plants. We can then use this data to determine what processes are limiting factors under specific conditions."

*** 

"We will be able to tell from that whether changes in specific genes are likely to improve performance. **Then we will need to take both the knowledge and the sensors to large numbers of plant breeders and engineers all over the world to record useful changes in crops.**"

*** 

"We will have to enable a lot of other people working in different disciplines and with different crops to take part.  **So we are building an open scientific platform that is accessible to a community of hundreds of research groups all over the world**."

*** 

13

**This approach has only recently become an option due to the rapid progress that has been made in technology, data science and in our understanding of plant science**, Kramer says. "But if we are to benefit from this progress, we must eliminate the barriers between disciplines. We must ensure that engineers, data scientists, biochemists, biophysicists, geneticists and plant breeders communicate and collaborate with each other. Fortunately, our co-founder Wageningen University & Research is a world leading centre of excellence for many of these disciplines. **The new institute will connect scientists and engineers, both within WUR and with institutes and organisations all over the world**."  [**Ex. 13**, JII Press Release (emphasis added).]

46.    The JII platform is supposed to enable wide-ranging community to measure photosynthesis in many crops in new ways—exactly like the PhotosynQ platform.

47.    More than 30 PhD students and 60 postdocs will be working on the research program at the JII in the years ahead.

48.    Professor Martin Kropff, the chairman of the JII Supervisory Board, was quoted "[w]e are delighted to have been able to attract someone with the stature of Prof David Kramer, and "[Kramer] has extraordinary knowledge and experience in various fields of photosynthesis research."  **Ex. 14**, WAGENINGEN UNIV. & RSCH., *New photosynthesis institute in Wageningen* (Oct. 10, 2023), https://perma.cc/EFD5-HATT.

49.    In violation of his Shareholder Agreement and applicable law, Dr. Kramer had also told Mr. Weebadde for the first time that he planned to make PhotosynQ's property open source, including the MicroPAR and MicroPoroQ.

14

50.     On October 6, 2023, Dr. Kramer told Mr. Weebadde that "[w]e don't have a conflict if we do this right and can work with support from JII.  But as we discussed the last time we met, **it will have to be open source**.  But that would allow PhotosynQ to use.  It will also give access to a nice market through JII."  **Ex. 15**, 10-2023 D. Kramer and Pro Email Chain (emphasis added).

51.     That same day, Mr. Weebadde responded: "I want to ensure you didn't tell me you will open-source the MiniPoroQ and MiniPAR.  I would never agree to it and wouldn't invest in Luka's time to manage the two products, if I had known the two [were going] to be open source.  Please show me any [piece of evidence] that you sent me about these two being open sourced.  If we open source the two products you basically killing PhotosynQ."  *Ibid*.

52.     Dr. Kramer further proposed that JII acquire PhotosynQ, without offering any consideration:

> There really are some great opportunities here with the new Institute and I've always intended to support PhotosynQ. . . . PhotosynQ clearly does not have the resources to develop the next instrument by itself. . . . But, from what I know, **the only way for any meaningful development to happen for PhotosynQ would be if we led it at the lab or the Institute[]**.  [*Ibid*. (emphasis added).]

53.     Specifically, Dr. Kramer sought for JII to acquire PhotosynQ's MultispeQ product line and its online platform, which would include PhotosynQ's valuable user data:

> I wanted to update you on JII and related opportunities.  If you are not interested, please let me know.  Maybe we can find another way to

15

move forward.  For example, **I could take off PhotosynQ's hands, the burden of MultispeQ and online platform**.  Could that simply things?

***

**I am suggesting that JII take over MultispeQ and the online platform**. [**Ex. 16**, D. Kramer Slack Messages (emphasis added).]

54.     Around this same time, Mr. Weebadde had learned that Dr. Kramer was also soliciting Mr. Kuhlgert for a position at JII.  Mr. Kuhlgert further confirmed that Dr. Kramer was discussing dissolving PhotosynQ to Mr. Kuhlgert and without any notice to Mr. Weebadde.

55.     On November 2, 2023, Luka Kramer had blankly informed Mr. Weebadde that he needed to take some extended time off.  **Ex. 17**, Emails from L. Kramer Re Hiatus. When asked for specifics and his return date to discuss the products he had been working on since 2021 (*i.e.*, the MiniPoroQ and MiniPAR), Luka Kramer cited "health related issues" and refused to provide a timeframe for return. *Ibid*.

56.     Mr. Weebadde responded by quoting the leave procedure in PhotosynQ's handbook and demanded that he follow this procedure accordingly. *Ibid*.; **Ex. 18**, PhotosynQ Handbook & L. Kramer Signature.

57.     The next day, Luka Kramer resigned from PhotosynQ effective immediately claiming he had been placed in an "untenable position" and "subjected to extreme duress."  **Ex. 19,** 11-3-2023 L. Kramer Resignation and Pro Response.

58.     Contemporaneous emails show Dr. Kramer encouraging Luka Kramer to resign from PhotosynQ without handing over physical or intellectual property of

16

PhotosynQ and attempting to open up PhotosynQ to legal liability.  **Ex. 20**, D. Kramer & L. Kramer Resignation Emails.

59.     Consistent with Luka Kramer's employment and confidentiality agreements, Mr. Weebadde requested that Luka hand over all the company assets, including MicroPAR and MicroPoroQ their designs, Bill of Materials, source code and notes by Wednesday, November 8, 2023, and that failure to do so would be considered theft of company property and appropriate actions allowed by law will be taken to retrieve them.  **Ex. 19**, 11-3-2023 Pro Email.

60.     On November 8, 2023, Mr. Weebadde met with Luka Kramer, with counsel present.  Luka Kramer returned a thumb drive containing some PhotosynQ property, but failed to return the MicroPAR and MicroPoroQ prototypes, MultispeQ firmware, and other related work-product claiming that he did not have them.

**COUNT 1**
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.**
**(*against Dr. Kramer & Luka S. Kramer*)**

61.     Plaintiff incorporates each of the prior paragraphs by reference.

62.     Dr. Kramer's and Luka Kramer's actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836 *et seq*.

63.     PhotosynQ has invested substantial time, money and effort into creating and developing its proprietary, trade secret, and other confidential information.  These trade secrets include (*a*) the MultispeQ and its technology, including MultispeQ firmware; (*b*) the MicroPAR and MicroPoroQ prototypes and

17

any work-product for these technologies; (*c*) the display features for user data on the PhotosynQ platform; and (*d*) the user data itself on the PhotosynQ platform (collectively as the "PhotosynQ Trade Secrets").

64.    PhotosynQ possesses numerous trade secrets, including the PhotosynQ Trade Secrets. PhotosynQ is an owner of the PhotosynQ Trade Secrets either as the entity having rightful legal or equitable title to the property or as the licensee under the Exclusive Licensing Agreement with MSU, **Ex. 8**.  See 18 U.S.C. § 1839(4).

65.    The PhotosynQ Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by others in the world agricultural industry who can obtain economic value from its disclosure or use.

66.    The PhotosynQ Trade Secrets are extremely valuable to PhotosynQ, crucial to the operation of PhotosynQ's business, and if available to others, would enable them to directly or indirectly compete with PhotosynQ to its detriment and the detriment of PhotosynQ's shareholders.

67.    The PhotosynQ Trade Secrets were and continue to be used in connection with PhotosynQ's products, services, and its platform for its users.

68.    PhotosynQ has invested substantial time, money, and effort into protecting the PhotosynQ Trade Secrets.

69.    PhotosynQ implemented reasonable commercial restrictions to ensure the PhotosynQ Trade Secrets would maintain their secrecy by requiring shareholders of PhotosynQ to enter into the Shareholder Agreement requiring that

18

"every Shareholder agrees that he or she will not disclose or use any confidential information he or she had access to while associated with the Corporation, other than on behalf of the Corporation." **Ex. 4**, Shareholder Agmt, ¶9(a).

70.     As a shareholder, Dr. Kramer was subject to such confidentiality terms under the Shareholder Agreement and had a duty to both maintain confidentiality and not use for his own purposes the PhotosynQ Trade Secrets, to which he continues to have access to.

71.     PhotosynQ further implemented reasonable commercial restrictions to ensure the PhotosynQ Trade Secrets would maintain their secrecy by requiring employees to enter into employment and confidentiality agreements.

72.     As an employee, Luka Kramer was subject to such confidentiality terms under his employment and confidentiality agreements.

73.     Upon information and belief, Dr. Kramer and Luka Kramer have improperly disclosed and/or used the PhotosynQ Trade Secrets, without express or implied consent from PhotosynQ, by (*a*) using the existing MultispeQ technology to start JII and developing a competing plant phenotyping platform through JII; (*b*) using the MicroPAR and MicroPoroQ technologies to develop competing photosynthesis sensors at JII; and (*c*) making or threatening to make the PhotosynQ Trade Secrets open source through JII.

74.     PhotosynQ, through the use of the PhotosynQ Trade Secrets, engages in interstate and foreign commerce by allowing its customers to connect and collaborate with other scientists worldwide by joining projects and sharing

19

measurements. PhotosynQ's platform aides over 8,000 users in over 30 countries in their growing operations and scientific experimentation.

75.     Although some of Dr. Kramer's and Luka Kramer's conduct may have occurred outside the United States, Dr. Kramer and Luka Kramer are citizens of the United States and acts in furtherance of Dr. Kramer's and Luka Kramer's misappropriation of the PhotosynQ Trade Secrets were committed in the United States.

76.     Dr. Kramer's and Luka Kramer's misappropriation of PhotosynQ's trade secrets in violation of the DTSA all occurred after May 11, 2016.

77.     Upon information and belief, Dr. Kramer and Luka Kramer continue to use the PhotosynQ Trade Secrets without the express or implied consent of PhotosynQ.

78.     Dr. Kramer's and Luka Kramer's acts constitute misappropriation of the PhotosynQ Trade Secrets under the DTSA.

79.     Dr. Kramer and Luka Kramer will, if not preliminarily and permanently enjoined by the Court, continue the acts and benefit off the misappropriation, causing PhotosynQ and its shareholders such as Venturit immediate and irreparable harm, damage, and injury.

## COUNT 2
### Violation of the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1901 *et seq*.
### (*against Dr. Kramer & Luka S. Kramer*)

80.     Plaintiff incorporates each of the prior paragraphs by reference.

81.     Dr. Kramer's and Luka Kramer's actions, as set forth herein, constitute misappropriation under the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.1901 *et seq*.

82.     The elements of misappropriation of a trade secret under the DTSA and MUTSA are substantially similar.  *Qualite Sports Lighting, LLC v. Ortega*, No. 17-607, 2019 WL 7582823, at *4 n.7 (WD Mich. Sept. 10, 2019) (Jonker, J.).

83.     PhotosynQ has invested substantial time, money and effort into creating and developing the PhotosynQ Trade Secrets (as identified above), and its proprietary and other confidential information.

84.     PhotosynQ possesses numerous trade secrets, including the PhotosynQ Trade Secrets.

85.     The PhotosynQ Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by others in the world agricultural industry who can obtain economic value from its disclosure or use.

86.     The PhotosynQ Trade Secrets are extremely valuable to PhotosynQ, crucial to the operation of PhotosynQ's business, and if available to others, would enable them to compete with PhotosynQ in detriment to PhotosynQ and its shareholders.

87.     The PhotosynQ Trade Secrets were and continue to be used in connection with PhotosynQ's products, services, and its platform for its users.

88.     PhotosynQ has invested substantial time, money, and effort into protecting the PhotosynQ Trade Secrets.

21

89.     PhotosynQ implemented reasonable commercial restrictions to ensure the PhotosynQ Trade Secrets would maintain their secrecy by requiring shareholders of PhotosynQ to enter into the Shareholder Agreement.  **Ex. 4**, Shareholder Agmt, ¶9(a).

90.     As a shareholder, Dr. Kramer was subject to such confidentiality terms under the Shareholder Agreement and had a duty to both maintain confidentiality and not use for his own purposes the PhotosynQ Trade Secrets, to which he continues to have access to.

91.     PhotosynQ implemented additional reasonable commercial restrictions to ensure the PhotosynQ Trade Secrets would maintain their secrecy by requiring employees to enter into employment agreements and confidentiality agreements.

92.     As an employee, Luka Kramer was subject to such confidentiality terms under his employment and confidentiality agreements.

93.     Upon information and belief, Dr. Kramer and Luka Kramer have improperly disclosed and/or used the PhotosynQ Trade Secrets, without express or implied consent from PhotosynQ, by (*a*) using the existing MultispeQ technology to start JII and develop a competing plant phenotyping platform through JII; (*b*) using the MicroPAR and MicroPoroQ technologies to develop competing photosynthesis sensors at JII; and (*c*) making or threatening to make PhotosynQ's Trade Secrets open source through JII.

94.     Upon information and belief, Dr. Kramer and Luka Kramer continues to use the PhotosynQ Trade Secrets without the express or implied consent of PhotosynQ.

95.     Dr. Kramer's and Luka Kramer's acts constitute misappropriation of the PhotosynQ Trade Secrets under the MUTSA.

96.     Dr. Kramer and Luka Kramer will, if not preliminarily and permanently enjoined by the Court, continue the acts and benefit off the misappropriation, causing PhotosynQ and its shareholders such as Venturit immediate and irreparable harm, damage, and injury.

## COUNT 3
### Breach of the Shareholder Agreement
### (*against Dr. Kramer only*)

97.     Plaintiff incorporates each of the prior paragraphs by reference.

98.     As a shareholder, Dr. Kramer is a party to the Shareholder Agreement, which constitutes a contract between Dr. Kramer, PhotosynQ and the other shareholders, such as Venturit.

99.     The Shareholder Agreement provides in pertinent part:

(a) **Every Shareholder agrees that so long as he or she is an employee of the Corporation,**[2] **he or she will not individually or in concert with any other person or company, either directly or indirectly, compete with the Corporation**, solicit the Corporation's customers, or induce or influence or attempt to induce or influence any employee or representative of the Corporation to terminate his or her employment with the Corporation. In addition, **every Shareholder agrees that he or she will not disclose or use any confidential information he or she**

---

2     The Shareholder Agreement defines PhotosynQ, Inc., as the "Corporation."

23

**had access to while associated with the Corporation, other than on behalf of the Corporation**.

(b) The term "compete" means engaging in the same or any similar business as the Corporation in any manner whatsoever, including, without limitation, as a proprietor, partner, investor, shareholder, director, officer, employee, consultant, independent contractor, or otherwise, within the United States.

(c) The term "confidential information" means flow charts, file layouts, source code listings, computer programs, manufacturing processes, secret formulas, customer information, financial information, and all other knowhow and trade secrets developed by and belonging to the Corporation, which gives the Corporation a competitive advantage over other businesses in the same field of endeavor.

(d) **The parties acknowledge that a breach of any of those covenants will irreparably and continually damage the Corporation, for which money damages will not be adequate**. In the event of a breach of this Agreement, the Corporation will be entitled to: (A) obtain both a preliminary and permanent injunction and such other injunctive and other legal and equitable relief as may be available to the Corporation in order to prevent any further or future violations of this Agreement, and (B) redeem the violating Shareholder's Shares for their Fair Market Value less a discount of 50%. [**Ex. 4**, Shareholder Agmt, ¶9(a), (d) (emphasis added).]

100.    The Shareholder Agreement is subject to and to construe under Michigan law. *Id*. at ¶12(b).

101.    Upon information and belief, Dr. Kramer has breached the Shareholder Agreement by directly or indirectly competing with PhotosynQ through his current or future work as director at JII, which engages or plans to engage in the same business as PhotosynQ worldwide. **Ex. 13**. Specifically, Dr. Kramer, through JII, is "develop[ing] advanced photosynthesis sensors and data

science tools" and "building an open scientific platform that is accessible to a community of hundreds of research groups all over the world." *Ibid*.

102.  Upon information and belief, Dr. Kramer has breached the Shareholder Agreement by making or threatening to make the PhotosynQ Trade Secrets and/or confidential information open source through JII. **Ex. 15**, 10-6-2023 D. Kramer Email.

103.  Upon information and belief, Dr. Kramer has breached the Shareholder Agreement by failing to return PhotosynQ's property, especially the MicroPAR and MicroPoroQ prototypes and the MultispeQ firmware, or conspiring with a current or former PhotosynQ employee, specifically Luka Kramer, to do the same.

104.  Upon information and belief, Dr. Kramer has breached the Shareholder Agreement by inducing or influencing Luka Kramer to terminate his employment with PhotosynQ, while also encouraging him to not return PhotosynQ property and attempt to open-up PhotosynQ to legal liability. **Ex. 20**.

105.  Upon information and belief, Dr. Kramer has breached the Shareholder Agreement by soliciting Mr. Kuhlgert, a shareholder of PhotosynQ, to join him in working at JII to compete against PhotosynQ.

106.  It is wholly violative of the Shareholder Agreement for Dr. Kramer to bring competing one of a kind products and platform to market through a competing organization such as JII.

107.  These misconducts by Dr. Kramer individually and collectively constitute breaches of the Shareholder Agreement.

25

108.   Dr. Kramer's breaches of the Shareholder Agreement damage Venturit and/or PhotosynQ in an amount exceeding $75,000.00.

109.   Because of these breaches, the Court should declare and order that Dr. Kramer's shares be redeemed by PhotosynQ, pursuant to the Shareholder Agreement, **Ex. 4**, Shareholder Agmt, ¶9(d).

**COUNT 4**
**Anticipatory Breach of the Shareholder Agreement**
(***against Dr. Kramer only***)

110.   Plaintiff incorporates each of the prior paragraphs by reference.

111.   As a shareholder, Dr. Kramer is a party to the Shareholder Agreement, which constitutes a contract between Dr. Kramer, PhotosynQ and the other shareholders, such as Venturit.

112.   Dr. Kramer has a legal duty to not compete with PhotosynQ, solicit PhotosynQ's customers, or induce or influence or attempt to induce or influence any employee of PhotosynQ to terminate his employment with the PhotosynQ. Further, Dr. Kramer has a legal duty that he will not disclose or use any confidential information he had access to while associated with PhotosynQ, other than on behalf of PhotosynQ.  **Ex. 4**, Shareholder Agmt, ¶9(a).

113.   Dr. Kramer has definitively and unequivocally asserted that he plans to make PhotosynQ's property open source and "develop advanced photosynthesis sensors and data science tools" and "build[] an open scientific platform that is accessible to a community of hundreds of research groups all over the world."  **Ex. 13**.

26

114.   Dr. Kramer's assertions amount to an anticipatory breach of his existing and continuing duties under the Shareholder Agreement.

115.   Dr. Kramer's anticipatory breach has damaged PhotosynQ and its shareholders such as Venturit in an amount to be determined at trial.

## COUNT 5
### Breach of Employment & Confidentiality Agreements
### (*against Luka S. Kramer only*)

116.   Plaintiff incorporates each of the prior paragraphs by reference.

117.   Luka Kramer signed the Employment Agreement with PhotosynQ which incorporated the Confidentiality Agreement relating to his confidentiality or intellectual property assignment obligations to PhotosynQ. **Ex. 9**, L. Kramer Employment Agmt.   Luka Kramer agreed that during his employment (and afterwards as applicable), he would be bound by, and will fully comply with, these additional agreements.   The Employment agreement, along with the Confidentiality Agreement, set forth the terms and conditions of his employment with PhotosynQ. *Ibid*.

118.   The Confidentiality Agreement provides in pertinent part:

3. **Confidential Information.**

a. **Protection of Information**. . . . I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working

27

hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

\*\*\*

5. **Company Property; Returning Company Documents**. . . . I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

\*\*\*

8. **Solicitation of Employees, Consultants and Other Parties**. As described above, I acknowledge and agree . . . that I will not use or disclose such Confidential Information except as authorized by the Company. I further agree as follows:

b. **Other Parties**. . . . I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.  [**Ex. 10**, Confidentiality Agmt, ¶¶ 3a, 5, 8b.]

119.    The Confidentiality Agreement is governed under California law. *Id*. at

¶12a.

120.   Upon information and belief, Luka Kramer has breached his Employment Agreement and Confidentiality Agreement by failing to return the MicroPAR and MicroPoroQ prototypes that he had helped develop during his employment at PhotosynQ, including certain work-product for the MicroPAR and MicroPoroQ, and the MultispeQ firmware.

121.   Upon information and belief, Luka Kramer has breached the Employment and Confidentiality Agreements by individually or in concert with Dr. Kramer, sought to make the PhotosynQ Trade Secrets and its confidential information open source through JII.

122.   For example, when discussing the timetable for developing the MicroPAR and MicroPoroQ products, Luka Kramer stated to Mr. Weebadde "**I know Dave has plans for the devices for part of the opening of institute**, so we are on a short deadline." **Ex. 21**, L. Kramer Slack Message (emphasis added).  Luka Kramer then continued: "You will have to talk to Dave about that, because **it is a conflict of interest to him if the development of the MicroPar/MicroPor is something that is solely meant for PhotosynQ**.  He has elaborated before that is something that he cannot do.  **The devices wouldn't belong to the institute in any way, but he will use the technology for his own research from my understanding.**" *Ibid*. (emphasis added).

123.   These misconducts by Luka Kramer individually and collectively constitute breaches of his Employment and Confidentiality Agreements.

124.   Pursuant to the Confidentiality Agreement, Venturit, on behalf of PhotosynQ, seeks to prosecute the rights of PhotosynQ to the PhotosynQ Trade

Secrets against Luka Kramer for his misappropriation of trade secrets within twelve months after his resignation.  **Ex. 10**, Confidentiality Agmt, ¶8b.

125.   Luka Kramer's breaches of the Employment and Confidentiality Agreements damage Venturit and/or PhotosynQ in an amount exceeding $75,000.00.

## COUNT 6
### Breach of Fiduciary Duties
### (*against Dr. Kramer only*)

126.   Plaintiff incorporates each of the prior paragraphs by reference.

127.   PhotosynQ is a Delaware corporation.

128.   As a director of PhotosynQ, Dr. Kramer owed fiduciary duties to protect the interests of PhotosynQ and to act in the shareholders' best interests—including the duties of loyalty and care.

129.   Upon information and belief, Dr. Kramer violated his duties of loyalty and care by misappropriating the PhotosynQ Trade Secrets and/or confidential information having in turn breached his fiduciary duties owed to PhotosynQ.

130.   Dr. Kramer's direct or indirect competition with PhotosynQ on behalf of JII and his making or threatening to make PhotosynQ's property open source are in bad faith and not in the best interests of PhotosynQ.

131.   His manipulation of PhotosynQ and the PhotosynQ Trade Secrets to make himself more marketable to JII are in furtherance his own self-interests over PhotosynQ's is a breach of his fiduciary duties.

132.   Upon information and belief, Dr. Kramer solicited Mr. Kuhlgert by offering him a position with JII in further competition with PhotosynQ.  He also has conspired with Mr. Kuhlgert to dissolve PhotosynQ and remove it from serving thousands of customers, employees, investors, and creditors in violation of his fiduciary duties as a director of PhotosynQ.

133.   Dr. Kramer's proposal for JII to take over MultispeQ and PhotosynQ's online platform demonstrates his attempt to steal PhotosynQ's most valuable asset for free—*i.e.*, PhotosynQ's community data—to the detriment of PhotosynQ and its shareholders.  **Ex. 16**, D. Kramer Slack Messages.

134.   Dr. Kramer's threat to file suit against the CEO of PhotosynQ, Mr. Weebadde, for performing his executive obligations to PhotosynQ customers, employees, investors, and creditors has negatively impacted PhotosynQ's corporate interests and the shareholders' value.

135.   Further, Dr. Kramer's competition with PhotosynQ through JII and his making PhotosynQ property open source threatens to place PhotosynQ in breach of the Exclusive License Agreement with MSU, in particular Article 6's confidentially provision.  **Ex. 8**, Exclusive Licensing Agmt, Art. 6.  PhotosynQ must act promptly to defend against and mitigate any damages caused by Dr. Kramer's unlawful actions.

136.   As such, Dr. Kramer has acted in his own self-interest which abrogates any business judgment defense that may have otherwise existed.

137.   Evidence through discovery will rebut any of Dr. Kramer's defenses to these breaches of fiduciary duties.

31

138.    As a result of Dr. Kramer's breach and inevitable breach of his fiduciary obligations, PhotosynQ and its shareholders, including Venturit, have suffered and continue to suffer damages.

**COUNT 7**
**Tortious Interference with Business Relationships**
**(*against Dr. Kramer and JII*)**

139.    Plaintiff incorporates each of the prior paragraphs by reference.

140.    PhotosynQ has contractual and/or business relationships with its customers that purchase the MultispeQ and any other PhotosynQ products and with its users that provide their data and utilize the PhotosynQ platform.

141.    PhotosynQ sells MultispeQs and other PhotosynQ products to customers worldwide and user data on PhotosynQ's platform provides independent, economic value to PhotosynQ.  The value of PhotosynQ's total sales and its user data exceed $75,000.

142.    Dr. Kramer, as a director and shareholder of PhotosynQ, knew of PhotosynQ's contractual or business relationships with its customers that purchased the MultispeQ and any other PhotosynQ products, along with its users on the PhotosynQ platform.

143.    Upon information and belief, JII would have learned and had knowledge of PhotosynQ's contractual or business relationships with its customers and users on the PhotosynQ platform through Dr. Kramer serving as the director of JII.   JII further would have learned of PhotosynQ's contractual or business relationships through its recruitment and engagement of Dr. Kramer as director of

32

JII.  Martin Kropff, the chairman of the JII Supervisory Board, stated: "[Dr. Kramer] has extraordinary knowledge and experience in various fields of photosynthesis research."  **Ex. 14**.  Dr. Kramer's experience in photosynthesis research includes relationships at PhotosynQ.  Finally, JII believably knew of PhotosynQ's contractual or business relationships as it is attempting to replicate PhotosynQ's platform— which is the only photosynthetic platform of its kind.

144.   By the wrongful conduct pleaded in the General Allegations and Counts 1–6 and 8, which are incorporated herein, Dr. Kramer and JII intentionally and improperly interfered with PhotosynQ's contractual or business relationships with its customers that purchased the MultispeQ and any other PhotosynQ products, along with its users on the PhotosynQ platform.

145.   Dr. Kramer's and JII's actions were wrongful per se.

146.   Alternatively, if Dr. Kramer's and JII's actions were lawful, their actions were unjustified and done with malice.

147.   Dr. Kramer's and JII's tortious conduct was an actual and proximate cause of the unlawful competition against PhotosynQ by disrupting PhotosynQ's sale of MultiSpeQs and other products to customers and further disrupting PhotosynQ's storage and collection of user data on its platform.

148.  PhotosynQ and its shareholders such as Venturit suffered and continue to suffer the loss of the economic value of the PhotosynQ Trade Secrets and confidential information, including its data on the PhotosynQ platform, and losses stemming from the Exclusive Licensing Agreement with MSU which provides exclusive licensing to PhotosynQ for commercial purposes.

33

149.   Dr. Kramer's and JII's tortious interference resulted in PhotosynQ and/or Venturit suffering damages in an amount exceeding $75,000.00.

150.   Dr. Kramer and JII are joint and severally liable for these damages.

**COUNT 8**
**Civil Conspiracy**
**(*against all Defendants*)**

151.   Plaintiff incorporates each of the prior paragraphs by reference.

152.   The object of Defendants' conspiracy was to misappropriate the PhotosynQ Trade Secrets and/or tortiously interfere with PhotosynQ's contractual and/or business relationships by starting an open source plant phenotyping platform in competition with and in detriment to PhotosynQ and PhotosynQ's shareholders.

153.   In furtherance of the conspiracy, Defendants committed numerous concerted actions as detailed the General Allegations and in Counts 1–7, which are incorporated herein.

154.   Upon information and belief, Dr. Kramer has failed to return PhotosynQ's property, especially the MicroPAR and MicroPoroQ prototypes and related work-product and the MultispeQ firmware, or conspired with Luka Kramer to do the same.

155.   For example, on October 20, 2023, when the PhotosynQ team requested access to MultispeQ firmware, Dr. Kramer shared a firmware version by omitting two essential files (do_command_DMK.h and do_command_DMK.cpp)

that were required to function. **Ex. 22**, D. Kramer Slack Message Re MultispeQ Firmware.

156. Upon information and belief, Dr. Kramer solicited Mr. Kuhlgert by offering him a position with JII in further competition with PhotosynQ. He also has conspired with Mr. Kuhlgert to dissolve PhotosynQ and remove it from serving thousands of customers, employees, investors, and creditors in violation of his fiduciary duties as a director of PhotosynQ.

157. Dr. Kramer encouraged Luka Kramer to resign from PhotosynQ without handing over physical or intellectual property of PhotosynQ and attempting to open up PhotosynQ to legal liability. **Ex. 20**, D. Kramer & L. Kramer Resignation Emails.

158. Defendants sought to accomplish to replicate PhotosynQ's business plan through unlawful means as detailed herein.

159. Defendants' actions directly and foreseeably injured or will injure PhotosynQ's business and property and unlawfully diminished PhotosynQ's shareholder value.

### COUNT 9
### Unjust Enrichment
### (*against Dr. Kramer and JII*)

160. Plaintiff incorporates each of the prior paragraphs by reference.

161. Upon information and belief, Dr. Kramer and JII have been and/or will be enriched at PhotosynQ's expense as a result of their individual or collective

actions of using PhotosynQ's property.  Any such enrichment is unjust and should, in equity and good conscience, be returned to PhotosynQ.

162.    As a result of Dr. Kramer's and JII's unjust enrichment, PhotosynQ has been damaged under circumstances in which it would make it unjust for Dr. Kramer and JII to retain the benefit without paying for it under Michigan law.

163.    PhotosynQ and Venturit has no adequate remedy at law and will suffer irreparable harm unless a trust is imposed over any amounts by which Dr. Kramer and JII have been unjustly enriched and JII, and all persons or entities acting on their behalf, including Dr. Kramer, Luka Kramer, and Mr. Kuhlgert, in concert with them or as their agents, are permanently enjoined from accessing or using PhotosynQ's property.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Venturit, Inc., respectfully prays that judgment enter in its favor as follows:

A.     Declare that the action is a proper derivative action and that Venturit is an adequate representative of PhotosynQ;

B.     Declare, under the authority granted to this Court by 28 U.S.C. § 2201, that Dr. Kramer has breached or anticipatorily breached the Shareholder Agreement, and order that Dr. Kramer's shares are to be redeemed by PhotosynQ pursuant to Paragraph 9(d) of the Shareholder Agreement;

C.     Declare, under the authority granted to this Court by 28 U.S.C. § 2201, that Luka Kramer has breached his Employment and Confidentiality Agreements;

D.     Preliminarily and permanently enjoin Defendants and their agents, officers, employees, successors, and all persons acting in concert with each or any of them from misappropriating the PhotosynQ Trade Secrets, from competing with PhotosynQ, and from tortiously interfering with the contractual and/or business relationships of PhotosynQ;

E.     As to Counts 1–9, award Plaintiffs their actual and consequential damages in an amount to be determined at trial, together with exemplary damages, interests, costs, and attorneys' fees;

F.     As to Counts 1 and 2, award all damages under the DTSA and MUTSA, including injunctive relief, monetary damages, twice such monetary damages for the willful and malicious acts of Dr. Kramer and Luka Kramer, and all reasonable costs and attorneys' fees;

IBUTZEL\000162468\0001\100600076.v3-12/14/23

G.      As to Count 9, order an accounting to validate and confirm the amount of all unjust enrichment received by Dr. Kramer and JII as a result of their conduct as described in this Complaint; and

H.      Grant all other relief this Court deems equitable and just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims.

Respectfully submitted,

BUTZEL LONG, P.C.

Dated: December 14, 2023

/s/ *Aaron L. Davis*

Aaron L. Davis (P77406)
Garett L. Koger (P82115)
Steven R. Eatherly (P81180)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864
(517) 372-6622
davisa@butzel.com
koger@butzel.com
eatherly@butzel.com
*Counsel for Plaintiff*

## **VERIFICATION**

Chandana Prabode Weebadde, being first duly sworn, deposes and states that he is the sole owner of Venturit, Inc. ("Venturit"), and a director, and the Chief Executive Officer and President of PhotosynQ, Inc., that he has read the attached Verified Shareholder Derivative Complaint, that he verifies same on behalf of Venturit and is duly authorized to do so; that the foregoing was prepared with the assistance and advice of counsel upon whose advice he has relied; and that the foregoing is true to the best of his knowledge, information, and belief.

                        _____

                        Chandana Prabode Weebadde
                        Owner of Venturit
                        Director, President and CEO of PhotosynQ

STATE OF MICHIGAN  )
                       )SS
COUNTY OF INGHAM  )

The above signatory, who is known to me, acknowledged the foregoing instrument this 14th day of December, 2023.

                        Janet L. Sparrow, Notary Public
                        State of Michigan, County of Ingham
                        My Commission expires: 10-23-28
                        Acting in the County of Ingham